Case number 21-2844 Rachel Post v. Trinity Health Michigan. Oral argument is not to exceed 15 minutes per side. Mr. Morgan for the appellant. Good morning, your honors, and may it please the court. My name is Sam Morgan. I represent the appellant who I will refer to in my argument as either Ms. Post or the plaintiff. I will refer to the respondent as either Trinity or the defendant. And as I just stated, I will reserve two minutes for rebuttal. As you all know, this is an appeal from an opinion in order entered by Judge Mark A. Goldsmith in the Eastern District of Michigan on July 30th, 2021, which granted a summary judgment motion against Ms. Post in favor of Trinity on counts one and two of her amended complaint. Count one asserted an interference claim under the Americans with Disabilities Act, section 503B. Count two alleged a conspiracy to discriminate in violation of the Americans with Disabilities Act in violation of section 1985-3 of the Civil Rights Act and section 512A of the ADA. In making its ruling to dismiss count one, the court instructed that a plaintiff asserting an ADA interference claim has the initial burden of offering proof of a prima facie case of interference, which includes an element of confidentiality. I have a question for you. Have you made an argument that Trinity Health is the employer of Ms. Post? No, we have not. Why is that not fatal to your claim that Trinity is not an employer for the ADA interference claim? Well, as Judge Goldsmith ruled in his opinion, it is possible for a plaintiff asserting an interference claim to assert that against a third party who has influence over the working conditions. Why is that? He relied on a dicta in our case, Bino, but Bino was an employment case. Bino was a public accommodation case. Setting aside that it was dicta, why wouldn't that be enough to distinguish it? The reason I say that is the way I read the statute is it suggests that part C of the statute, subsection C, says it incorporates the remedial provisions of the employment section, the public accommodation section, and the third section. And the employment section, it seems to me, quite clearly requires an employer to be the defendant. And so why should we just incorporate that remedy? Your Honor, the reason for that is because the realities of the workplaces, especially today, and in hospitals throughout Michigan, the independent contracting entity like UPG typically has an exclusive contract to provide a certain type of services in the hospital. In this case, the anesthesiology services. They employ all of the anesthesiologists and all of the CRNAs, at least at the time of Ms. Post's employment. That's common all over the country, isn't it? That's common all over the country. And so what did Trinity do here? Well, what happened is that with respect to the anesthesiology services, the chairman of the anesthesiology department for UPG became a member of the medical staff at Trinity, at St. Joseph Mercy Hospital. His subordinate, Dr. Hakeem, became the chief of the anesthesiology service at St. Joseph Mercy Hospital. Additionally, both Dr. Ellis and Dr. Hakeem were associate professors at Wayne State University Medical School. And Wayne State University Medical School is one of the entities that also these two doctors are wearing all three hats. While they're working at St. Joseph Mercy Hospital, they're wearing the hat of UPG employees. They're wearing the hat of being physicians who are directing employees, including St. Joseph Mercy Oakland Hospital employees at the hospital. And they're wearing the hat of Wayne State University Medical School professors with Dr. Ellis, who was the chair of the UPG anesthesiology department, serving as the chair of the simulation education department for the Wayne State Medical School and having a position of substantial influence over the operation of the simulation lab, which was the post had to get re-qualified after a period of time. Is that correct or not? Post had to, I couldn't hear your question. Did post have to go through a re-qualification once she was ready for for service again, or is that not true? Well, she was released to return to work by her treating physician on March 6th of 2017. And while Dr. Ellis claims that he thought Ms. Post required neuropsychological evaluation before she returned to the workplace, no one. And he admitted he never communicated that to Ms. Post. And the HR director, Ms. Mulcrone admitted she never communicated that requirement to either Ms. Post or the workers comp claim adjuster or the nurse managers who were involved in the return to work effort for Ms. Post. The only thing that that was communicated to Ms. Post was that they weren't allowing her to return to work. Then St. Joseph Mercy, Oakland, with the encouragement and consultation with Dr. Hakeem, who's Dr. Ellis's subordinate, put the kibosh on the process of Ms. Post becoming recredentialed to be able to perform CRNA services at St. Joseph Mercy Hospital, which was a requirement for her to do that. And in order for her credentials to be processed or presented to the committee, the credentialing committee, by July of 2017, and St. Joseph Mercy Hospital had brought it along to get it approved until Dr. Hakeem, at the direction of Dr. Ellis and UPG, told St. Joseph Mercy, Oakland, that UPG would not go along with that. And as a result, St. Joseph Mercy, Oakland, put a kibosh on her application for renewal. So just getting back to, as I understood your response to my question about why shouldn't the interference provision be limited to employers, I was talking about just as a matter of statutory interpretation. And your response was, well, the hospital has a whole bunch of chiefs or doctor heads who are also employees of UPG. Why does that matter for purposes of the statute? If we think that the statute only covers employers, why does the fact that her employer also has some people who are managers of the hospital matter? Well, because the hospital provides the conditions of employment, for most of the conditions of employment, for Ms. Post, as a contractor who worked solely at St. Joseph Mercy, Oakland. They provided the place, the physical location for her to perform her services. They provided most of the staff who influenced or created the conditions under which she worked. And in this case, they provided a simulation lab, which was used by the residents that participated in the anesthesiology residency program that St. Joseph, Oakland, and Wayne State Medical School, and Dr. Ellis and Dr. Hakeem were intimately involved in supervising, which provided the simulation lab for training, not only for the residents. Can I ask you a question? What's your best case to show that there's a link here as a cause of action to a non-employer under the vaccine? St. Joseph, Oakland's employee, Dr. Narupal Gopinath, responding to the nurse case manager, Desi Johnson, who had asked for permission to allow Ms. Post to utilize the simulation lab for one or two weeks. It was three or four sessions of graduated work so that Ms. Post could begin her return to work first through simulated work evaluated by her physician to determine how she was handling the work. Is there a good case to support your theory here? Can you hear me? Yes, I can. Okay. Is there a good case from the Sixth Circuit or Supreme Court to link a cause of action here beyond the employer? Yes. In the Rose v. Wayne County case that we cited, Judge Lawson from the Eastern District relied on Rohrer v. City of Stowe, which is 743-Fed-3-1025, which is a 2014 case from the Sixth Circuit Court of Appeals. The Rohrer case established the evidentiary standard for an interference claim that we proposed in responding to Trinity's motion for summary judgment. It's that four-part test that is used for retaliation claims. The Rose Court referred to that Rohrer test as the test that would be used for interference claims. First point, plaintiff engaged in the activity protected by the ADA. Second point is that the defendant knew of that activity. Third point is that the defendant took adverse action against plaintiff. Fourth point is that there is a causal connection between the protected activity and the adverse action. If there is a culpability requirement in that standard, I would submit to the court that the second, third, and fourth points of the test provide that culpability standard. Thank you, Mr. Morgan. Thank you. Thank you, Your Honors. Dave Sasanti appearing on behalf of Trinity Health, who is the defendant slash appellee. Your Honors, I would note that at the lower court level, we raised the point that I finding that a claim under 503B is actionable under any circumstances, quite frankly, but certainly not these circumstances. The district court judge, as you're aware of, saw it differently and required the parties to submit supplemental briefing with regard to what the standard should that there is a cause of action. We believe that to the extent any such claim is actionable, which it sounds like Your Honors are correctly skeptical about, that would be the test that was set forth in the Youngblood case, which is a case from the Middle District of Tennessee, I believe. Let me just make sure I'm correct on that. Yeah, Middle District of Tennessee from 2010. In that case, the court looked to a Ninth Circuit case, which was the Brown versus City of Tucson decision, and agreed with the Ninth Circuit that when analyzing a claim under 503B, the test should be the test that's used under claims under the Fair Housing Act because the language in the anti-interference section of the Fair Housing Act mirrors the anti-interference language under the ADA. We believe the Youngblood court was correct in that particular analysis. Then the Youngblood court looked to this court's decision in the Babin case, B-A-B-I-N, which was a case under the FHA, in which the Sixth Circuit said, quote, in order to rise to the level of interference with the rights of the plaintiff, the alleged interference must have been motivated by a discriminatory animus. Where do you get, set aside for a moment, whether it is limited to employers, where would you get the discriminatory animus requirement or element from the statutory text? I could see it maybe in some, coerce or intimidate, have maybe some type of background, why are you coercing, but just, it shall be unlawful to interfere with any individual in exercise of a right. Where in that text is there a discriminatory animus element? Well, clearly it's not written into the statute explicitly, but as the district court judge noted, and we had argued at the lower court level, if there is no element of culpability, then an employer or a third party, for example, if you recall the analogy that was drawn or the district court, where there was essentially what could have happened here very well, a request by the plaintiff to use the simulation lab at U of M, University of Michigan, and University of Michigan for completely legitimate reasons says, no, we're not going to allow that to occur. As the judge correctly noted, if there is no culpability standard involved in libel under the statute, even though it did not take any action that was nefarious, improper, or designed to interfere, it simply said no to a request for legitimate reasons. But isn't that, I hear you, but the Supreme Court has now told us quite clearly that text must trump policy arguments. So it seems to me you're making a policy argument that the statute is absurd if read in that broad fashion. And I'm certain that we're allowed to just say, well, we can't apply the statute as written because it would lead to absurd results. Your Honor, that's not exactly what I'm saying. Title VII, all of these statutes, the ADA, which of course is the one we're under, all have developed tests through the courts over time that are designed to determine whether or not the defendant has engaged in discrimination, which is an intentional act, has engaged in retaliation, which is an intentional act, has engaged in harassment, which is an intentional act. In this case, the interference that we would be talking about is an intentional act. The third party intentionally interfered with the plaintiff's rights under the statute. And there has to be some measure of culpability to that interference because otherwise we're just looking at a situation where the plaintiff wanted something to happen and it didn't happen. And as long as what the plaintiff wanted to have happen didn't happen, it could be deemed interference, again, regardless or irrespective of the defendant's motive. So I think anytime you're operating within these types of statutes, none of which I don't think, Your Honor, has that expressed language. Like for example, Title VII, the McDonnell-Douglas burden-shifting approach, I don't think there's anything in the statute that talks about pretext or anything of that nature, but the court's designed a test in order to vet out appropriate behavior versus inappropriate behavior, discrimination versus legitimate non-discriminatory reasons, retaliation versus legitimate non-retaliatory reasons. If we think that maybe that argument is a reason to say that the statute is best read when you read it and light up the remedies, the subsection C, to only cover employers, do you think that there's still this discriminatory animus element to the interference provision, if it were limited solely to employers? I do think that anytime that you're dealing with a right such as, in this case, the right to be free from interference under the Americans with Disabilities Act, so someone is attempting to exercise a right based on their status as a disabled individual, yes, I do think there still has to be a culpability standard there. Otherwise, employers are really not going to know how to operate under those particular statutes, and even worse, getting back to the district court's analogy with the request to use the lab at University of Michigan, in that case, I would suggest, and again, that's not an employer situation, so maybe it's not directly responsive, but you might find situations where employers are actually compelled to grant particular requests, because if they don't, even if they have a perfectly good reason for not doing so, they would be liable, and this case presents the perfect example of that. As your honors have noted many times, Trinity slash St. Joe's Mercy Oakland was not the plaintiff's employer, and they were attempting to re-credential her, multiple times they attempted to re-credential her, and UPG, which was her employer, said she's not actively employed, and therefore, we're not taking any steps to move forward with her credentialing process, and there was testimony from multiple individuals saying once that happened, then Trinity's hands were tied, and if there's no culpability standard that goes with that particular process, then there could be a scenario under which Trinity, while not even knowing that the plaintiff was disabled, not knowing that what she was requesting for these to use the simulation lab and the like was a request for an accommodation under the ADA, could potentially be liable. So, I think whenever you're dealing with a standard or a statute, if you will, that talks about coercion, intimidation, threatened, those are very clear, I think, when we can figure out, I think, pretty clearly if someone was coerced, intimidated, or threatened. Interference is a little bit more nuanced, and in that sense, I think you have to have some culpability standard under the statute so that we can determine was this interference in the legal sense or was this, in the context of this particular case, an employer taking legitimate actions, unmotivated by any animus whatsoever, unmotivated by the plaintiff's alleged status as a disabled individual, unmotivated by any potential request for that had ultimately, to some degree, an adverse consequence on the plaintiff. Yeah, let me ask you, is there not anything in the record here where, isn't there evidence that the hospital was aware of Ms. Post having a disability that prevented her from going back to work, that she needed this access? Is there not anything in the record? Is that your position? Yeah, yes, that is. So, start with the fact that the first time that anyone from the hospital becomes aware that the plaintiff is even on a leave of absence is during an exchange with someone from Trinity Health in July of 17, I believe. She doesn't identify the reason, she just indicates that she's out on a leave of absence, which could be for any number of reasons. And then there's a discussion later on between Deanne Wehrman and plaintiff, and there's no discussion of any potential disability at all. And keep in mind that what the plaintiff is dealing with is a concussion, which I would suggest to your honors is not something that, if you hear someone suffered from a concussion, that readily comes to mind, oh, this person's disabled. So, to my recollection, there's nothing in the record that would show that Trinity was aware of the specific reasons that the plaintiff was out on a leave of absence. And certainly, there's no evidence in the record that anyone from the hospital was told or even thought that potentially the plaintiff was requesting some type of an accommodation due to a disability. Keep in mind, she gets injured in October of 16, and five months later, she's essentially cleared to return to work subject only to being able to do some work hardening in the simulation lab. So, you've got a very short-term condition. The plaintiff's essentially recovered from that condition in five months. It's not made known to anyone at the hospital. Do you think that under the statute, under the interference provision, she has to have a successful claim? Or do you think, suppose somebody says, I'm disabled and I need an accommodation. It turns out under the relevant definition of disabled, that person is not disabled. But because of the request for the accommodation, the employer or some other party takes an adverse action against the plaintiff, say fires the plaintiff. Don't you think that that would be covered by B, even though technically the plaintiff wouldn't have been able to make out an ADA claim on the merits? Your Honor, as much as I'd like to argue to the contrary, I know there, being intellectually honest, I know there's case law where requesting an accommodation can potentially create a cause of action under the ADA, even if the person does not have a disability. So, as much as I'd like to argue to the contrary, I don't want to be disingenuous. So, I think it's possible that a non-disabled individual who's requested an accommodation under the ADA, so it's very clear what we're dealing with here, might have a cause of action for interference. I can also feel pretty confident here that there's no evidence to support such a finding in this case. Again, there's literally no evidence that anyone from the hospital perceived anything that the plaintiff requested in this case as a request for an accommodation. Those words were never used with anyone at all. Do you have a Sixth Circuit case that you relied on in the overall case that you would like to use or that the district court used that you support? Well, Your Honor, as we pointed out at the lower court level at the beginning of my argument today, no, we do not because there's been no Sixth Circuit case recognizing this type of cause of action. If Your Honors are inclined to believe that such a cause of action exists, the closest that we can come is the Middle District of Tennessee's incorporation of the Babin opinion, which is 18 Fed Third 337, and the Robb opinion, which is 162 Federal Appendix 460, where the Babin court specifically says that cases under the FHA, which have the exact same anti-interference language, there must be some discriminatory animus, and Robb says even retaliatory animus is not enough. And Judge Murphy, I guess looking at and trying to answer your question a little bit better, I would say the Babin court read into, maybe not read into the statute, but interpreted the FHA of requiring discriminatory animus in order to prove interference under the FHA, even though the FHA language is identical to the ADA Section 503B language, meaning that at least some of your colleagues looked at that particular language and said we need to come up with a standard that measures what interference is, and in that case they said it's discriminatory animus. Thank you, Mr. Casante. Thank you very much. Mr. Morgan, do you have rebuttal? Yes, your honor. I'd like to address Mr. Casante's response to your question, Judge Bush, about the evidence in the record that demonstrates that Trinity had Ms. Post had a disability, was attempting to return to work with a reasonable accommodation, that they were informed of her disability, the fact that she was trying to return to work, and what that evidence is. In the record, there's evidence that Jennifer Swisher, who works for Trinity, who was involved in the credentialing renewal application process, was in contact, communication with Ms. Post in early June 2017, where she told, Ms. Post told Ms. Swisher that she was on a medical leave and trying to get back to work. That was one of the individuals who was reporting to Ms. Deanna Weirman in the process of credentialing renewal. Then there's Dr. Narupa Gopinath, who is employed by Trinity, who was contacted by Desi Johnson, one of the nurse case managers, on multiple occasions in June 2017, explaining to her that she was assisting Ms. Post in her effort to return to work and needed to use the simulation lab for gradual simulated work activities as she attempted to return to work. Desi Johnson's testified to that in a declaration, and even Dr. Ellis has shared what the Trinity care team were attempting to do during June, even May of 2017. Mr. Morgan, your time is up. Thank you, counsel, for your arguments. We will take the matter under submission.